**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                        **REPORT and**
            - against -                    <u>**RECOMMENDATION**</u>

JAMES TUNSTALL,

                                CR 18-675 (JMA) (AKT)
                    Defendant.
-----------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

On December 19, 2018, the Grand Jury handed up an Indictment against defendants James Tunstall and Jay Tenem, charging them with one count of conspiracy to distribute controlled substances, 21 U.S.C. § 841(a)(1) and one count of distribution of a controlled substance causing death, 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C). Specifically, James Tunstall and Jay Tenem's[1] charges arise from their alleged involvement in narcotics trafficking, particularly with respect to heroin, in and around October 2018. Defendants are charged with knowingly and intentionally distributing heroin, the use of which ultimately resulted in the death of an individual.

On November 24, 2019, James Tunstall ("Defendant" or "Tunstall") moved to suppress statements he made to law enforcement officials after his arrest on October 29, 2018. *See* Defendant's Notice of Motion [DE 45]. In February 2020, Judge Feuerstein referred the motion to this Court for a Report and Recommendation as to whether the motion should be granted.[2] See DE 52. Specifically, Tunstall argues that his requests for a lawyer were repeatedly ignored,

---

[1]     Jay Tenem pleaded guilty to Count 2 of the Indictment on February 12, 2019. He is currently awaiting sentencing.

[2]     After Judge Feuerstein's untimely death, this case was reassigned to Judge Azrack.

the manner in which he was questioned was unlawful and the statements that he gave should therefore be suppressed. *See* Memorandum of Law in Support of Defendant Tunstall's Motions [DE 46]. In response to the motion, the Government filed a letter advising that it was consenting to a pre-trial hearing on the motion to suppress the defendant's post-arrest statements. *See* DE 5. This Court conducted an evidentiary hearing regarding the defendant's motion on March 11, 2020.

For the reasons set forth below, this Court respectfully recommends to Judge Azrack that the motion to suppress be DENIED. In particular, the defendant contends, among other things, that his post-arrest statements should be suppressed because he "repeatedly invoked his right to counsel during the initial arrest, [the] subsequent search of his home and continued questioning while in police custody." DE 46 at 2. However defendant maintains that law enforcement officers and/or agents continued to question him. *Id*. Defendant asserts that on October 29 and 30, 2018, he was the subject of a custodial interrogation. In order to use the defendant's statements at trial, defendant's counsel contends the Government must establish that Tunstall was informed of his constitutional rights and knowingly waived them. *Id*. The Government takes the position that Tunstall was properly Mirandized and made voluntary statements after a voluntary waiver of his *Miranda* rights and that his Declaration should be discounted in its entirety. Tr. 4.[3] Ultimately, the government argues that the defendant's motion to suppress should be denied. *See* Government's Memorandum of Law in Opposition to the Defendant's Motion to Suppress his Post-Arrest Statements ("Govt.'s Mem.") [DE 6] at 1.

_____

[3]    "Tr." refers to citations to the transcript of the suppression hearing and "GX" refers to exhibits admitted during the hearing.

Prior to the evidentiary hearing, and in support of his motion, defendant Tunstall submitted a Declaration which his counsel states "raises a significant and material question of fact as to the voluntariness of his alleged statements to law enforcement." *Id*. According to Tunstall, on October 29, 2018, he parked his car near his residence in Westbury around 9-10 p.m. and "was immediately surrounded by at least three (3) unmarked police cars" from which four to five police officers exited and pointed their guns at him while screaming "get out of the car!" Defendant James Tunstall's Supporting Declaration ("Tunstall Decl.") [DE 47] ¶ 4. They were joined by 20-30 other police officers, at which point Tunstall states he exited the car and was handcuffed and he asked the police why he was being arrested. Tunstall Decl. ¶ 4. He permitted the officers to search his car, but initially refused to give consent to enter his home. *Id*. ¶¶ 7, 11. According to Tunstall, the police repeatedly asked him about drugs and whether there were any weapons in his house. *Id*. ¶ 12. He maintains that he invoked his right to counsel at least 10 times during this period which lasted about 45 minutes. At that point, he relented and knocked on the door of his house. His mother answered and let the defendant as well as the police officers in. *Id*. ¶¶ 14, 16, 17. After an hour of questioning, Tunstall states he was told that he was under arrest for selling narcotics which resulted in a death. *Id*. ¶ 20. The defendant was eventually taken to the police station where he states that after being held for 5-6 hours, he was read a *Miranda* warning from a pre-printed card. According to Tunstall, he told the police officer who read the card to him that he could not read it due to his diabetes. He maintains that he was "exhausted, frightened, starving, dehydrated, experiencing opioid withdrawal, blurred vision, and cognitive impairment." *Id*. ¶¶ 24-26.

Having conducted a full evidentiary hearing, including an assessment of the demeanor of the testifying witnesses, the Court finds the version of the events defendant provided in his

3

Declaration to be less than credible.  Rather, the Court credits the version of the arresting and interviewing detectives as elicited at the hearing.  Based on the assessment of the credible testimony presented by the testifying witnesses and the evidence produced during the suppression hearing, the Court concludes that the defendant's arguments for suppression of his post-arrest statements are without merit.

## I.  FINDINGS OF FACT

Two special agents of the Drug Enforcement Agency who participated in the defendant's post-arrest statement testified at the suppression hearing.  After evaluating the credibility of the witnesses and the other evidence offered at the evidentiary hearing, as well as defendant Tunstall's Declaration, the Court makes the following findings of fact.

### A.    Drug Enforcement Special Agent Scott Knox's Interactions with Defendant

Special Agent Scott Knox ("Agent Knox") of the United States Drug Enforcement Agency ("DEA") is assigned to the Long Island Heroin Task Force.  Tr. 6.  The Task Force conducts complex narcotics investigations involving primarily heroin, oxycodone and fentanyl. *Id*.  On the evening of October 29, 2018, after the completion of his workday, Agent Knox received a call from his supervisor and was told that the Nassau County Police Department ("NCPD") was investigating an overdose death.  *Id.* 8.  His supervisor directed him to go to a location in Freeport, New York to join other law enforcement officers.  Agent Knox spoke with an undercover officer who told him that a person had overdosed in Syosset, New York and that an NCPD detective had obtained the victim's phone and was texting with the supplier in an attempt to lure the supplier out to deliver more heroin.  *Id*.

4

Through the texts the undercover officer had received, Agent Knox learned that (1) another individual had been arrested who had been delivering the drugs on behalf of the defendant and (2) this individual was providing information where he was to meet the defendant. *Id*. 10.  As a result, Agent Knox received a phone call directing him to an address in Westbury. The supplier turned out to be James Tunstall.  *Id*.  Agent Knox was given an exact address in Westbury where it was believed Tunstall was going, along with a description of a vehicle but no license plate.  *Id*. 10-11.  Upon arriving, he established surveillance fairly close to the residents, a two-story single-family house.  He observed Special Agent Robert Garcia parked on the corner across the street from the house.  Other officers were in the vicinity on side streets*. Id*. 12. Shortly thereafter, Agent Knox observed a vehicle fitting the description that had been given which was now parked on the corner near the residence.  Agent Knox and other law enforcement officers approached the vehicle on foot with weapons drawn.  *Id*. 13.  He asked Tunstall to get out of the vehicle and then placed him in handcuffs, thereby effecting his arrest for narcotics sales.  *Id*.  Agent Garcia asked Tunstall if the officers could search his car and Tunstall said they could*. Id*. 14.  Once Tunstall's consent was given, the officers searched the vehicle and found a cell phone, an iPhone.  They walked Tunstall a short distance to his mother's residence.  *Id*. Agent Knox informed Tunstall that he was under arrest for narcotics violations, although he was not very specific and did not mention the overdose at that time.  *Id*. 15.

After noticing some jewelry and personal property in Tunstall's pockets, Agent Knox asks Tunstall if the officers could go inside his home – his mother's home – and leave his personal property with her.  *Id*.  Tunstall was reluctant to go inside the house and appeared that he did not want his mother to know he had been arrested.  *Id*.  Knox did not ask for permission to search the house because he had no reason to do so. Id. 16.  Eventually, the officers knocked on

the door and Tunstall's mother opened it.  At some point, Tunstall agreed to allow the officers

into the house.  Id.  Agent Knox spoke with defendant's mother and advised her that an

individual had overdosed and died and that law enforcement believed her son had sold that

individual the fatal dose.  *Id*. 19.   The items which defendant had on his person at that time were

given over to his mother.  The items included a wallet with miscellaneous credit cards, some

papers, a New York driver's license for defendant Tunstall, a silver-colored bracelet and a silver-

colored chain with pendant.  *Id.* 21.  Agent Knox filled out a receipt which the DEA uses for

property or cash.  *Id*. 20.  He identified the receipt which was admitted into evidence as

Government's Exhibit 3.  *Id*.

    While at the house, defendant Tunstall was given water by his mother.  Id. 22.  She was

not interrogated by law enforcement while at the house and was not asked any questions about

the victim or his drug selling or his supplier are anything about the case at that time.  He did not

state that he wanted to speak to a lawyer during the 45 minutes to an hour while he and the

officers were at the house.  *Id*.  The house was not searched.  *Id*. 23.  At approximately 12:30

a.m., Agent Knox left the location and drove to the Major Case Bureau of the NCPD in Bethpage

where Tenem and Tunstall were taken for processing.  *Id*. 23.   He did not transport Tunstall and

did not recall who did.

    Upon arriving in Bethpage, Knox conferred with other agents who were there to get up to

speed on the events which occurred at the victim's residence and the arrest of Jay Tenem.  *Id.* 24.

At Knox's direction, Tunstall was brought into an interview room.  DEA Special Agent Francis

Rau was also present in the interview room.  *Id.* 25.  Agent Knox observed that Tunstall was

fairly calm at that time.  They told him that Tenem had already been arrested.  Agent Knox read

Tunstall his rights.  The Agents also told Tunstall that law enforcement had obtained cellphones

6

with text messages between him, the victim, and Tenem. *Id*. They generally advised Tunstall that he was in a lot of trouble, that they were federal agents, and that it was likely he was going to be facing federal charges. *Id*. 25-26. Agent Knox identified Government Exhibit 4 as the advice of rights form that he read to James Tunstall that evening and that Tunstall and he signed. *Id*. 26; GX 4. According to Knox, he read the form to defendant Tunstall at the beginning of the interview that evening which took place at approximately 1:52 a.m. *Id*. 27. Knox wrote the information next to "Place, Date and Time." *Id*. 28. In the space next to each sentence stating the person's rights, Knox testified that the defendant placed his initials next to each line in the presence of Knox. *Id*. Tunstall then signed the form. *Id*. 29.

Knox also testified that at the bottom right of the form, the first witness signature is his and the second witness signature is that of Special Agent Rau. Id. In the middle of the form, right after the "Waiver of Rights," there is an "X" next to the statement "Someone has read to me this advice of rights." *Id*. Knox confirmed that he made the "X" -- meaning that he read the form verbatim to Defendant Tunstall. *Id*. According to Knox, Tunstall verbally acknowledged that he understood these rights and he also signed the form, after which he agreed to speak with Agent Knox. *Id*. Knox did not ask the Tunstall any questions prior to Tunstall's executing the form. *Id*. at 30. After that, Knox told Tunstall that it was in his best interest to cooperate and that the circumstances were different because he was being charged with a federal crime, not like his previous state arrests. *Id*. In talking to Tunstall about the severity of the charges, Knox also told him that the text messages from the victim's cell phone were in in the hands of law enforcement and there was a lot of evidence against him already. *Id*. The agents began to ask him about his supplier, but Tunstall was initially very reluctant to give up any information about the supplier. *Id*. at 31. Eventually, he provided some information to the agents, including the

supplier's name, Alex, and that Alex lived off Front Street in Uniondale and drove a late-model white Camry. *Id*. Tunstall stated that he knew Alex for a long time and that he got heroin from Alex which he sold. *Id*. 31-32. Tunstall got cocaine from another source of supply. He also acknowledged that he gave heroin that he purchased from Alex to Jay Tenem to deliver to the victim. *Id*. 32. Tunstall expected to be paid by the victim through Jay Tenem. Id. The information Tunstall gave the agents with respect to his supplier panned out. *Id*. 33.

The agents asked Tunstall to open his phone which was locked with a code so that they could obtain the text messages and other information from the phone, especially Alex's phone number. *Id*. Tunstall was reluctant and refused to open the phone. *Id*. Agent Knox later learned the password from the DEA technical operations division which was able to hack the phone after many months of trying. The phone was opened pursuant to a federal search and seizure warrant. *Id*. 34. The password turned out to be Tunstall's date of birth. *Id*. During the interview with Tunstall, Agent Rau took notes. Agent Knox subsequently prepared a report which contained the substance of Tunstall's statements to him during the post-arrest interview. *Id*. He identified Government Exhibit 1 as his report which he prepared on October 31, 2018, the day after the interview. *Id*. 35. Agent Knox testified that Tunstall never told him that he was "dope sick" during the interview. Nor did Tunstall ever tell him at any time that he was suffering from heroin or opioid withdrawal. Based on Knox's training and experience, Tunstall did not appear to Knox to be withdrawing from narcotics. *Id*. 36. Tunstall did not exhibit any symptoms of restlessness, fidgeting, nausea or sweating. If he had, the agents would have been required to take him to get a "Fit for Confinement." At one point during the interview, Tunstall did mention that he was diabetic, but he did not take insulin shots and it appeared to be something controlled more with diet. *Id*. 37.

8

The post-arrest interview of Tunstall lasted approximately a half hour.  Knox testified that at no point did Tunstall ask for a lawyer.  *Id*. 38.  At the very end of the interview, Knox testified that they had basically reached a standstill with respect to further information on Alex and opening the phone.  The agents stopped questioning Tunstall and that was the end of the interview.  *Id*. 39.  At that point, Tunstall asked for a lawyer. In response, the agents stopped all questioning and left the interview room.  Knox went home from there.  Other agents transported the defendants to be lodged overnight.  *Id*. 40.

The government introduced Exhibit 5 which Agent Knox identified as a physical condition questionnaire utilized by the NCPD.  Law enforcement personnel provided the form to Agent Knox.  *Id*. 41.  Exhibit 5 was admitted into evidence over the objection of defense counsel.   Agent Knox noted that according to the form, the responses to the questionnaire were being given orally at approximately 2:45 a.m. on October 30, 2018.  *Id.* 47.  The responses from defendant Tunstall were taken down by a Nassau County police officer whose name and shield number are listed on the form.  Next to the question "are you in good health," Agent Knox *I*pointed out that the response is "yes."  *Id*. 48.  Tunstall responded "no" to the question: do you need a doctor?"  Where asked if he had any injuries, the response is "none."  *Id*. 48.  According to the form, when asked how much alcohol. He had consumed, Tunstall responded, "none."  *Id*. 49.  Knox testified that he recognized Tunstall's signature because he had seen it on fingerprint cards as well as the advice of rights form that the defendant signed earlier that evening.  *Id*.  after Tunstall's signature, the form states, "does defendant have any apparent injuries?"  The response given by the desks officer who signed the form was "no."  *Id*.  The desk officer responded yes to the question "does the defendant appear to be in good health?"  *Id*. 50.

Agent Knox testified that he became aware Tunstall and Tenem were being lodged elsewhere overnight. *Id.* He identified Government Exhibit 7, the October 30, 2020 NCPD Physical Condition Questionnaire (PDCN 79SJ) for James T. Tunstall. *Id.* 53. Exhibit 7 essentially mirrors the questionnaire appearing in Exhibit 5. The fourth question on Exhibit 7 reads as follows: "What drugs do you use/When last used?" Tr. 50. The response was "none." *Id.*; GX 7. The form further states, "The defendant appears to be in good health with no visible injuries." *Id.* 54; GX 7. It was signed by the desk officer. Question number 6 states "Detainee has history of drugs or alcohol abuse (Note drug and when last used)." The response "no" was checked off next to that question. *Id.* 55; GX 7. The response "no" also appears next to question 16A, "detainee is apparently under the influence of alcohol or drugs." *Id.* 56; GX 7.

On the morning of October 30, 2018, Agent Knox arrived at NCPD Headquarters and transported Jay Tenem to the federal courthouse in Central Islip at approximately 9:30 a.m. Agent Doherty transported Tunstall to the courthouse. Upon arrival, they waited for the United States marshals to let them into the building and they went to Pre-trial Services where the defendants were to be interviewed and a report prepared primarily for use in a bail determination. *Id.* 59. Agent Knox was not present for the Pre-trial Services interview with the defendants. However, he did identify Government Exhibit 8 as the Pre-trial Services Report for defendant Tunstall. *Id.* 60. Knox confirmed that in the section entitled "Substance Abuse," Tunstall did not say that he had used any drugs in the past 24, 48 or 72 hours. *Id.*; GX 8. Instead, he stated that the last time he used drugs was a week ago. *Id.* 61; GX 8.

Agent Knox identified Government Exhibit 9 as medical records he obtained by subpoena from the Nassau County Correctional Center. *Id.* 62; GX 9. Next to the section titled "I.V. Drug User," the letter "N" for "no" is circled. *Id.* 63; GX 9. In the section entitled "Intake

Screening," the question is asked "Do you have any medical conditions at this time?"  The response is checked "yes" with the comment "last physical five months ago."  GX 9.  Knox testified that there are some abbreviations for hypertension and diabetes and then next to that, the form states "non-compliant with medicines."  *Id*. 64; GX 9.   Further, next to the question "Do you have any current complaints?" the box under "no" is checked off.  *Id*.; GX 9.  According to the form, where the question was asked, "Do you use street drugs?" Tunstall checked off "yes" and wrote "oxycodone."  *Id*.; GX 9.  He added that he last used the drug a week ago and had no current or prior withdrawal symptoms.  *Id.* 65; GX 9.  Knox confirmed that there was nothing in the forms indicating that Tunstall was "dope sick" or "withdrawing" from oxycodone.  *Id.* Defendant Tenem told Agent Knox that Tunstall said he did not use drugs; however, Tenem was also aware that Tunstall told law enforcement during a previous arrest that he did use drugs with the goal of getting drug treatment rather than incarceration.  *Id*. 66.

Defendant Tunstall's "Declaration" was admitted into evidence as Exhibit 2.  The prosecutor asked Agent Knox to focus on paragraph 12 where Tunstall described what allegedly happened inside his mother's home on the night of his arrest.  *Id.* 73.  Tunstall states that he initially refused to give consent to enter the house for approximately 45 minutes. The officers asked him if he had drugs in the house and if there were weapons in the house.  *See* GX 2. According to Tunstall, "it was clear to me that they were statements made with an intent to elicit an incriminating response."  Tunstall Decl. ¶ 12.  According to Tunstall, he replied "No. Just take me to jail. I want to talk to my lawyer."  *Id*. ¶ 13.  Agent Knox testified that Tunstall never said such words and never invoked his right to counsel while at his mother's house.  Tr. 73-74. Further, Knox stated that the defendant never told anyone that he was "dope sick," nor did he ever attempt to open his phone.  *Id*. 74.  Agent Knox said Tunstall never told him that he could

not remember the password.  *Id.*  Although Tunstall states in paragraph 23 of his Declaration that he repeatedly said he wanted to speak to a lawyer, Knox testified that Tunstall never did so until a point towards the end of the questioning at the Major Case Bureau after he had been Mirandized.  *Id.* 75.  And contrary to Tunstall's assertions, Knox testified that Tunstall was not held for 5 to 6 hours and was not read the *Miranda* warning from a preprinted warning card, but rather from a preprinted form.  Tunstall never expressed to Knox that he was exhausted, frightened, starving, dehydrated, experiencing opioid withdrawal, blurred vision and cognitive impairment at all, nor did Tunstall appear to be experiencing any of those things.  *Id.* 77.

On cross-examination, Knox confirmed that when he approached Tunstall's car, he had his weapon drawn.  *Id.*  The other officers who had handguns had them drawn as well.  *Id.* 78. Tunstall was compliant when he was told to get out of his car and he was immediately handcuffed.  *Id.*  Tunstall remained handcuffed the entire time he was outside his mother's home. While Tunstall was standing outside the house, Agent Knox told him he was "in a lot of trouble, that I was the DEA."  *Id.* 80.  Knox told Tunstall he was under arrest for narcotics distribution but Knox did not mention the overdose at that time.  *Id.*  The conversation between Knox and Tunstall at that time had to do with Tunstall's jewelry and personal belongings which he would not be able to take to the precinct.  Knox was suggesting that Tunstall give those things to his mother.  *Id.*  Knox did not tell Tunstall about the overdose death until they were inside the home and in the presence of Tunstall's mother.  *Id.* 81.  Defendant's counsel showed Knox some 3500 material, namely, 3500-SK-3,[4] which is the DEA-6 form.  Agent Knox testified that the DEA-6 shows Tunstall verbally agreed to discuss the circumstances of his arrest with law enforcement inside of his residence. There he was advised that he was arrested for distribution of heroin and

---

[4]    The Government's 3500-SK-3 was subsequently admitted in evidence.  *See* Tr. 91.

that the heroin he had recently sold to an individual was believed to be the cause of the overdose death of that customer. *Id*. 84. In response to defense counsel's question whether Knox was trying to get Tunstall to give up other people involved with potential drug dealing while he was outside or inside Tunstall's mother's house, Knox responded "no." *Id*. 87. On re-direct, Agent Knox affirmed that Tunstall never verbalized any need for medical treatment on the night of his arrest and did not appear to Knox to have any emergent medical condition. *Id*. 90.

**B.     Drug Enforcement Special Agent Francis Rau's Testimony**

Special Agent Francis Rau, a 20-year agent with the DEA, was assigned to the Long Island Heroin Enforcement Group as well as the Long Island Heroin Task Force when the underlying incidents of this case occurred on October 29, 2018. The Task Force focused on opioid- related overdoses and the Heroin Enforcement Group focused on heroin-related investigations. Tr. 93. On October 29, 2018, Agent Rau learned from a Nassau County police detective - Detective Dave Twomey - of an apparent related overdose of a victim named Niko Alvarez. *Id*. 94. Rau learned that Detective Twomey had already done some investigative work with respect to the source of supply and what he believed went on the preceding day, October 28. Detective Twomey had been acting in an undercover capacity and had control of the victim's phone. *Id*. 95. The communications Twomey had were in the form of text messages through the use of the victim Niko Alvarez's phone. *Id.* 96. Twomey had already been texting with the source of supply of the heroin. *Id*.

At that time, the goal was to see if the source of supply would be willing to provide a quantity of heroin to the undercover. *Id*. Rau and those conducting the investigation had an understanding that an individual whose nickname was Math had been involved in a prior arrest where the name Math was used – that individual was James Tunstall. *Id*. Rau sat with Twomey

and continued to be in contact with Tunstall via the victim's cellphone.  *Id*. 97.  According to

Rau, it was understood eventually that Tunstall was willing to provide the victim, or the

undercover, with another quantity of heroin and cocaine as he had previously provided on

October 28.  *Id*.  Tunstall was trying to find the original runner from the preceding day or some

other individual to actually become the runner to transport the drugs from him to the heroin

customer.  *Id*. 97-98.  Rau testified that the runner from the previous day was Jay Tenem and that

he would be the one to transport the drugs to the undercover.  *Id.* 98.  When Rau learned that

Tenem had been arrested and was transported to the Nassau County Major Case Unit, he went

with Detective Twomey to that location to meet with Tenem.  *Id.* 99.

   Tenem eventually cooperated with Rau.  *Id*. 100.  Agent Rau reviewed text messages

within Tenem's phone and then helped facilitate a control phone call from Tenem to defendant

Tunstall.  *Id*.  During that call, Tenem mentioned that he had the money and they had made an

agreement on where to meet for Tenem to provide the money to Tunstall.  *Id*.  Rau stated that

this was a ruse to get Tunstall out so that he could be arrested and questioned.  *Id*.  Rau was not

present when Tunstall was arrested.  *Id*. 101.  Eventually, Agent Rau met Tunstall in one of the

interview rooms in the precinct which Rau characterized as a "nondescript interview room.

White walls, approximately 10-by-12 type of room."  *Id*. 102.  Rau spoke with Special Agent

Knox as it related to the interview of defendant Tunstall.  Both of them participated in Tunstall's

interview.  *Id.*  Rau and Knox were primarily seated during the interview.  *Id*. 103.  Rau initially

noticed Tunstall's demeanor to be very calm and composed, but concerned.  *Id.*  Rau testified

that "I told him right up front that you're in a very serious situation, that we have very good

evidence with respect to you supplying a heroin customer who we believe to have died from a

heroin-related – – heroin overdose." *Id*. With regard to further inquiry about the conversation

with Tunstall, Rau stated:

> A.      . . . I told him listen to me first before any questions are asked, because this is your opportunity for us to act, and our goal is to get to his supplier. We understand where you are right now, and I felt very confident with the evidence that we had at that time, we knew who – – Mr. Tunstall was the heroin source.
>
> I proceeded to tell him that the – – if – – you know, we're going to eventually ask you your rights, and that this is your decision whether you want to work with the Government, anything that you provide, any statements you make, will be noted to the prosecutor, and then the judge will be notified with respect to your cooperation.
>
> Q.      As you are describing all of this to the defendant, did his demeanor change at all?
>
> A.      No.
>
> Q.      Did he remain calm yet concerned?
>
> A.      Yes.
>
> Q.      Did he say or do anything in response to providing this information, and essentially this evidence that you have against him?
>
> A.      He was listening. He was listening to the evidence. I mean, in fact, I went as far as to show, like, the text messages that – – that we had in control from the victim's phone to his phone. So he's fully aware of what's going on. It wasn't like – – you know, I was just very up front with the matter, and it was just something that this is his opportunity to act now so that we can focus on getting to his supplier, which was primarily our main concern was to get that main supplier.
>
>                  *       *       *
>
> Q.      Specifically, when you show the defendant. The text messages, did he say or do anything?
>
> A.      he observed it. He looks at them. He didn't really make any comment and it was just – – it was just a matter of letting him know what we have at hand already.

15

Q.    after this preliminary conversation and you describing to the defendant. All the evidence that you have against him. Is it fair to say that at that point he was Mirandized?

A.    Yes, at that point.

*Id*. 104-105.

Agent Rau thereafter identified Government Exhibit 4 as the advice of rights that defendant James Tunstall had signed.  *Id*. 106; GX 4.  When asked to describe how it was that Tunstall was *Mirandized* using that form, Agent Rau testified that he was present as Agent Knox read Tunstall his rights, and after each statement, Tunstall had used his initials.  *Id.*  Both Rau and Agent Knox signed the form as witnesses and Tunstall signed the document just below the waiver of rights form.  Rau pointed out where Tunstall placed his initials before each statement of his rights.  Upon further questioning, Rau testified as follows:

Q.    Following his advisement of rights, did the defendant acknowledge that he understood those rights?

A.    Yes.

Q.    Did he say that verbally?

A.    Yes.

Q.    Did he also indicate that he was agreeing to answer your questions?

A.    Yes.

Q.    And did he do that verbally?

A.    Yes.

Q.    Could you please describe for the Court how that conversation went forward following the Miranda rights?

A.    At that point, we had asked him that – – Scott – – Agent Knox had asked him are you the supplier who supplied heroin to a runner, both on October 28th and October 29th to a heroin customer, to give to a heroin customer, and he acknowledged that he was the supplier of heroin.

16

According to Agent Rau, the focus then became more on who Tunstall's source of supply was. *Id.* 108. Tunstall stated that the source of supply was a person by the name of Alex whom Tunstall had known for at least 10 to 15 years. *Id.* Tunstall would generally purchase heroin from Alex in the raw form, not in the packaged form. Tunstall had essentially received bulk heroin from Alex and that was his main heroin source of supply. *Id.* 109. He did not know or would not disclose Alex's last name. Agent Rau felt that Tunstall knew more about the main source of supply but he was not willing to provide full statements with respect to his knowledge of that source. *Id.* at 110.

In reviewing Government Exhibit 1 (Agent Knox's "Report of Investigation"), Agent Rau testified that the document was a report prepared for post-arrest statements for defendant Tunstall which contains the sum and substance of Tunstall's statements made to both Agent Knox and Agent Rau that night. *Id.*; GX 1. There were attempts made to see if Tunstall could get into his phone to get the number for his source of supply. *Id.* 111. Tunstall was reluctant to give the agents consent to get into the phone at that time. *Id.* He never gave the agents consent to get into the phone that night. *Id.* Toward the end of the interview, when Tunstall was not forthcoming in his statements, Rau stated that Tunstall decided to say that he wanted to speak to his attorney. *Id.* 112. Rau told Tunstall that was his right and that they would terminate the interview. Rau testified that all the statements Tunstall provided came before his request for a lawyer. *Id.* He added that both he and Agent Knox spent approximately a half hour to 45 minutes with the defendant in the interview room at the Major Case Bureau. *Id.* Before being transported to the NCPD detention facility in Mineola, Tunstall was asked questions by members of the NCPD. *Id.* 113.

Agent Rau was asked to review Government Exhibit 5 which he identified as the Nassau County Physical Condition Questionnaire. *Id.*; GX 5. Rau was aware of the questions and the answers when he transported the defendant to the detention center in Mineola. *Id.* DEA Special Agent Joe Doherty accompanied Agent Rau to the Mineola Headquarters. *Id.* 114. Rau was in Tunstall's presence during the arrest processing. *Id.* After reviewing Government Exhibit 7, the NCPD Physical Condition Questionnaire, Rau testified that these questions were asked of Tunstall and that he, Rau, was physically present when Tunstall answered them. *Id.* 115. At the completion of the question and answer period, Rau testified that after Tunstall was taken into custody by the NCPD, Rau left the building and went home. *Id.*

Agent Rau saw Tunstall later that day in a courtroom at the Alfonse D'Amato Federal Courthouse in Central Islip. *Id.* 116. He testified that during his involvement with the defendant on October 29 and 30, 2018, the defendant never exhibited any signs of being dope sick or going through opioid withdrawal. *Id.* Nor did Tunstall ever tell Rau that he was experiencing opioid withdrawal. *Id.* 117. Likewise, Tunstall was drinking water and did not appear to be dehydrated according to Rau. *Id.* On cross-examination, with respect to Tunstall's cell phone, Agent Rau reiterated that Tunstall was asked for consent to get into the phone at that time and he was not willing to provide a statement which would enable Agent Rau or anyone else to get into the phone. *Id.* 121.

At the conclusion of Special Agent Rau's testimony, the Government rested. *Id.* 123. Defense counsel then stated that the defendant rested as well. After some statements from counsel for the Government and defense counsel, the Court set a schedule for post-hearing briefing.

18

### III.     STANDARD OF REVIEW

"To introduce a defendant's custodial statements at trial, the government must show by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights against self-incrimination." *United States v. Smith*, No. 14-CR-485, 2015 WL 7177190, at *4 (E.D.N.Y. Nov. 16, 2015) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); *Colorado v. Connolly*, 479 U.S. 157, 168, 107 S. Ct. 515,  93 L.Ed.2d 473 (1986).  *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), "requires all individuals who are under arrest, or otherwise in police custody, to be informed prior to interrogation, *inter alia,* of their right to remain silent and to have an attorney present during questioning." *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009); *United States v. Chandler,* 15-CR-131, 2016 WL 11481202, at *9 (E.D.N.Y. June 16, 2016).  This requirement to inform applies only to a "custodial investigation."  *Georgison*, 588 F.3d at 155.  As to the scope of the term "interrogation," the Second Circuit has stated that interrogation refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rosa v. McCray*, 396 F.3d to 10, 220-21 (2d Cir. 2005).

Therefore, "prior to the initiation of questioning," the government is required to inform a suspect of "the [government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present… if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quoting *Miranda*, 384 U.S. at 468-70).  The government bears the burden of proving by a preponderance of the evidence, both that a defendant was advised of his constitutional rights under *Miranda* and that

he knowingly, intelligently, and voluntarily waived those rights. *See Lego v. Twomey,* 404 U.S. 477, 482-89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

Further, it is well settled that the "actual statements of the defendant are admissible only if they are made voluntarily." *Smith*, 2015 WL 7177190, at *4, n.3 (citing *Dickerson v. United States,* 530 U.S. 428, 433-34, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). A court's determination whether the statements are voluntary must be based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). "For a waiver to be voluntary, the waiver must have been the product of a free and deliberate choice rather than intimidation, coercion or deception." *Smith*, 2015 WL 7177190, at *4 (quoting *Moran*, 475 U.S. at 421).

Moreover, for a defendant to make a knowing and intelligent waiver, he must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. The determination of whether a defendant's statement was voluntary "is highly fact specific." *Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998). Factors relevant to the totality of the circumstances are (1) the characteristics of the accused, such as his experience, background, age and intelligence; (2) the conditions of interrogation; and (3) police conduct, such as handcuff restraint, physical abuse and psychologically coercive tactics. *Green v. Scully*, 850F.2d 894, 901 (2d Cir. 1988).

## IV.     CONCLUSIONS OF LAW

### A.     Post-Arrest Statements and Admissibility

Defendant Tunstall seeks suppression of all statements made to law enforcement "due to the tainted nature of the interrogation procedures employed by the DEA agents involved." Defendant's Post-Hearing Letter Brief ("Def.'s Brief") [DE 67] at 1. The crux of defendant's

argument is that Tunstall's post-*Miranda* statements "were preceded by extensive pre-*Miranda* interactions with law enforcement while he was in custody that amount to an improper two-part interrogation." *Id*.

In making this argument, defendant Tunstall's counsel relies heavily on *United States v. Pritchette* -- a 2016 decision by Judge William Pauley in the Southern District of New York. In *Pritchette*, 219 F.Supp.3d 379 (S.D.N.Y. 2016), Judge Pauley found that the facts surrounding the defendant's arrest and detention indicated "the use of an impermissible, two-step interrogation process." *Id*. at 384. However, the factual overlay of *Pritchette* is readily distinguishable from the circumstances here. Pritchette was identified as a robbery suspect as the result of the NYPD's circulating images of a bank robbery and asking for the public's help in identifying the perpetrator. *Id.* at 382. While waiting for a medical appointment at 5 p.m. one day, Pritchette was arrested and taken to the 40th Precinct. *Id*. Sgt. Michael LoPuzzo, who supervised the lead investigator in the case, accessed the NYPD computer and reviewed Pritchette's case file, including the "wanted flyer." Approximately 50 minutes after he was arrested, Pritchette arrived at the precinct at 5:50 p.m. and was taken to the detective squad office where the interrogation room was adjacent to a holding cell. LoPuzzo closed out of the computer system at 5:57 p.m. *Id*. Pritchette's videotaped interrogation started at 6:27 p.m. Pritchette claimed that during the half hour interval, he was subject to a two-step interrogation process. Specifically, as to the first round, Pritchette pointed to LoPuzzo's taking him to the interrogation room. *Id*. Pritchette was permitted to carry his baseball cap. *Id*. Without activating any of the recording devices, or advising Pritchette of his *Miranda* rights, LoPuzzo started questioning Pritchette about the specific robbery. *Id*. LoPuzzo told Pritchette that he had been identified as the robber and that the police had a video of the robbery, fingerprints from the

gun, and fingerprints on a cart left behind in the store.  *Id.*  LoPuzzo then showed Pritchette some photos of the robbery and had Pritchette identify himself as the robber.  *Id*.  After obtaining these incriminating statements, LoPuzzo took Pritchette out of the room.  *Id.*  Significantly, Pritchette left his baseball cap in the interrogation room.  *Id.*

Pritchette was brought back to the interrogation room a second time -- this time with all the recording devices activated.  *Id.*  The video showed Pritchette bending over and picking up his baseball cap from under the table.  *Id.*  Likewise, the video showed Sgt. LoPuzzo reading Pritchette his *Miranda* rights.  *Id.*  Over the next nine minutes, LoPuzzo -- without the use of the photographs -- interrogated Pritchette about the robbery and elicited incriminating statements from him.  *Id*.

After being held in state custody for about a month, Pritchette was then arrested by federal officers and charged with Hobbs Act robbery.  *Id.*  Before bringing Pritchette to Pre-Trial Services, federal ATF agents questioned him for about an hour.  *Id.*  A video recording of the ATF questioning shows agents advising Pritchette of his *Miranda* rights.  *Id.* at 383.   The agents referred to Pritchette's prior confession and advised him that they had read the NYPD reports and knew what he had said previously to Sgt. LoPuzzo.  *Id.*  When Pritchette asked about the content of his previous statements, the agents said they needed to hear it from him.  The agents then elicited the same incriminating statements that Pritchette had made to LoPuzzo.  *Id.*

Pointing to *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), Judge Pauley noted that "Law enforcement may not circumvent *Miranda* by engaging in a two-step interrogation process whereby a person is questioned without the proper warnings, made to confess, *Mirandized*, and then questioned again."  *Pritchette*, 219 F.Supp.3d at 383. Judge Pauley observed that in evaluating whether a later-*Mirandized* interview "is tainted by

22

such a two-step process, courts look to the totality of the objective and subjective evidence surrounding the interrogation.'" *Id.* (quoting *Moore*, 670 F.3d at 229). Taking his lead from *Seibert*, Judge Pauley discussed the factors the Second Circuit had indicated are helpful indicia in this analysis. *Id*. at 384. These Seibert factors are: "[1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615, 124 S.Ct. 2601.

In addressing the timing factor, Judge Pauley stated that there was a "significant gap between the time Pritchette arrived at the precinct at 5:50 p.m. and the time when the videotaped interrogation began at 6:27 p.m." *Pritchette,* 219 F.Supp.3d at 384. Sgt. LoPuzzo attributed the delay to certain administrative duties which the court determined would/should have taken just a few minutes. *Id.* LoPuzzo's recollection of the events was undermined when he testified that he had not opened Pritchette's case file -- which the computer Audit Report directly contradicted. LoPuzzo had accessed the case file at 5:40 p.m., before Pritchette arrived. *Id.* The Audit Report also showed that LoPuzzo accessed the "wanted flyer" which included a photo taken from the robbery video. That information supported Pritchette's version of events, including the fact that LoPuzzo had shown Pritchette pictures from the video of the robbery. *Id.*

Significantly, the videotape also demonstrated that Pritchette's baseball cap was in the interrogation room *before* Pritchette entered the room on camera. *Id.* at 385. LoPuzzo claimed at the suppression hearing that Pritchette had the hat in his hand when he entered the room and dropped it. *Id.* However, the video showed Pritchette entering the room empty-handed and then searching for the hat under the table. *Id*. After the hearing, LoPuzzo submitted a declaration

23

essentially recanting his testimony. *Id.* Ultimately, the court found that the statements in defendant Pritchette's declaration were corroborated by the hearing evidence which Judge Pauley credited. *Id.* at 386. In granting the motion to suppress, Judge Pauley stated that "[h]ere, the agents made clear from the beginning of the interrogation that it was a continuation of the April interrogation. The video reveals that the first tactic employed was to remind Pritchette that he had already confessed, and that the records of the prior confession had been reviewed. ... The agents then covered substantially the same ground as LoPuzzo in April." *Id.* at 387.

Notwithstanding defendant Tunstall's demand for a *Seibert* analysis, the circumstances here concerning Tunstall do not fit into the pattern of *Seibert* factors which Judge Pauley relied upon in *Pritchette.* First, this Court finds that Tunstall was in custody outside his mother's house, having just been handcuffed and arrested. However, the Court credits Agent Knox's testimony that Tunstall was not interrogated at his mother's house and was not asked any questions about the victim or his drug selling or his supplier or anything about the case at that time (Tr. 22) -- contrary to Tunstall's statements that the agents "stormed his house and searched it for 20-30 minutes" (Tunstall Decl. ¶ 18) and questioned him for an hour (Tunstall Decl. ¶¶ 18, 20). The record does not support defendant's contention that he was interrogated at his mother's house after being held at gunpoint by multiple law enforcement officers, having had his car searched and his phone seized, having "discussed" the overdose death of an individual -- circumstances which the defendant equates to an "initial interrogation" – for which he was not given *Miranda* warnings and which consequently tainted the "official" interrogation at the Major Case Bureau. *See* Def.'s Brief at 3-4.

The Court finds that there simply was no interrogation. **"**Police are required to administer *Miranda* warnings only when a suspect is subjected to 'custodial interrogation.'"

*United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 447, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).  "It is clear… that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation."  *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).  In these circumstances, therefore, law enforcement officers were not required to administer *Miranda* warnings to Tunstall at his mother's home.

Given Tunstall's contentions, it is significant to note that he did not testify at the hearing. Nor did he call his mother as a witness, nor any of the civilian occupants of the house that night -- nor Agent Garcia -- to testify at the suppression hearing in support of his claimed "initial" interrogation theory.  Likewise, Tunstall did not call upon any of these potential witnesses to bolster his assertion that he "invoked my right to counsel, at least 10 times during this stage of the encounter … approximately 45 minutes" while he was at his mother's residence.  Tunstall Decl. ¶ 14.  Agent Knox testified unequivocally that Tunstall never said he wanted to speak to a lawyer while at his mother's house.  Tr. 22-23.

As to the second *Seibert* factor, since there was no "initial" statement given or made by Tunstall at the residence, there was no "overlapping content" in the purported second statement at the Major Case Bureau.  Further, in terms of the third *Seibert* factor, *i.e.*, timing, Pritchette was at the police precinct for both interrogations, the timing of which Judge Pauley found suspect. Here, Tunstall was not interrogated at the residence and made no statement there.  The only interrogation which took place was at the NCPD Major Case Bureau.

The only law enforcement officer at the Major Case Bureau during the interrogation of Tunstall who had also been present at Tunstall's residence was Special Agent Knox.  Agent

Garcia, who had been at the residence, was not present at the Major Case Bureau during the questioning of Tunstall, nor were any of the other officers who had been at Tunstall's house. Agent Rau, who did participate in the interrogation of Tunstall at the Major Case Bureau, was not at the residence when Tunstall was arrested. Consequently, Tunstall has failed to establish the fourth *Seibert* factor in terms of continuity of police personnel. And, since there was no initial interrogation at the residence, the fifth *Seibert* factor does not apply here either, because Agent Knox and Agent Rau's questions did not treat the questioning at the Major Case Bureau as somehow continuous with a non-existent first interrogation. *See United States v. Carter,* 489 F.3d 528, 536 (2d Cir. 2007) (rejecting two-step interrogation argument where the "post warning questioning was not the continuation of the pre-warning questions").

The most critical aspect of *Pritchette* is that Sgt. LoPuzzo actually lied on several occasions as to the events surrounding the interrogation of Pritchette. No such deception is present in the testimony of Special Agents Knox and Rau which this Court has found credible. And, whereas the record evidence in *Pritchette* corroborated the statements in Pritchette's declaration, the hearing record in the instant case refutes Tunstall's declaration at virtually every paragraph. *See Pritchette*, 219 F.Supp.3d at 386. Having considered the "totality of the circumstances," this Court concludes that the hearing testimony provided no evidence of a deliberate two-step strategy to deprive the defendant of protection afforded by the Fifth Amendment." *Moore*, 670 F.3d at 230. There is no *subjective* evidence of intent here -- no testimony by any officer of an intent to use a two-step technique. *Id*. The *objective* evidence outlined above, affirmatively weighs against concluding that the government engaged in a two-step process designed to undermine Tunstall's Fifth Amendment rights. Defendant's argument here, including his reliance on *Pritchette*, collapses under its own weight.

26

**B.**    **Voluntariness of Defendant's Post-Arrest Statements**

Defendant contends that the government "did not and cannot overcome the presumption of compulsion here."  Def.'s Brief at 4.  The Court disagrees.

Defense counsel asserts that there are significant doubts as to the veracity of Agent Knox's testimony, particularly with respect to the contents of the DEA-6 -- Agent Knox's "Report of Investigation" -- regarding Tunstall's post-arrest statement.  *See* Def.'s Brief at 2; GX 1.  For the sake of clarity, the Court points out that Government Exhibit 1 and Government 3500-SK-3 are the same document, namely, Agent Knox's Report of Investigation.  Counsel bases his argument, among other things, on several responses of "I don't recall" by Agent Knox. The conclusion drawn by counsel, however, misconstrues Knox's answers with regard to the DEA-6.

Among other things, counsel argues that from the time Tunstall was stopped by law enforcement, he was in custody and handcuffed.  *Id*. at 1.  There is little if any dispute about that fact.  Defense counsel maintains that there is a discrepancy between Knox's testimony and the contents of the DEA-6.  The portion of the DEA-6 which defendant's counsel focuses on states that "Tunstall verbally agreed to discuss the circumstances of his arrest with law enforcement inside of his residence.  Inside the residence, Tunstall was advised that he was arrested for the distribution of heroin and that heroin that he had recently sold to an individual was believed to be the cause of the overdose death of that customer.  Additionally, Tunstall was advised that Tunstall's 'runner' Jay (Tenem) was arrested earlier that evening."  Def.'s Brief at 1; GX 1. In particular, counsel argues that Agent Knox "could not account for the disparity" in that entry and "the lack of information about what was discussed at the residence, other than to speculate that there may have been a discussion about Mr. Tunstall cooperating with law enforcement" (citing page 86 of the transcript).  Def.'s Brief at 2.  Specifically, defense counsel highlights the

27

difference in wording:  the DEA-6 states that Tunstall agreed "***to discuss*** the circumstances of his arrest" (emphasis in original).  It does not state that Tunstall agreed to "listen," according to counsel, nor does it say that Tunstall was Mirandized.  *Id*.  Rather, counsel argues that the form simply "omits anything that Mr. Tunstall said in response to the DEA agents' statements and/or questions . . . which is conveniently paired with Agent Knox's claimed lack of recollection during his otherwise detail-oriented account of events."  *Id.*

Defense counsel theorizes that notwithstanding Agent Knox's lack of recollection, "there's no other logical reason why the agents' interactions with Mr. Tunstall would have been characterized on the DEA-6 as an agreement by Mr. Tunstall to "discuss" the circumstances of his arrest other than that Mr. Tunstall did, in fact, engage in a discussion with the Agents while he was in custody." *Id*.   That conclusion, however, is pure conjecture, unsupported by any actual evidence in the record.   The actual exchange between defendant's counsel and Agent Knox is significant:

> Q.   So, why have a conversation with Mr. Tunstall at the residence? Again, I understand you don't recall it, but just going based upon the information in the report.  Why have a conversation with Tunstall about whether he would be willing to have a verbal discussion of the facts of this case if you did not intend to have that conversation at that point?
>
> A.   I don't recall.  Perhaps if he was willing to cooperate at that point. I would have Mirandized him and begun questioning at his mother's home.  That didn't happen, and for whatever reason, we decided to take him to the Major Case Bureau.
>
> Q.   But at least based upon the report, Mr. Tunstall is giving information about the investigation at that point, correct? Additional information from what you had told him outside.
>
> A.   Yes.
>
> Q.   But again, I understand you don't recall, but based upon the report and whatever you can recall, it is your contention at this point that

> Mr. Tunstall did not respond to any of those pieces of information that he was given at his mother's residence?
>
> A.     *Yes*.  I don't recall a response.

Tr. 85 (emphasis supplied).  Aside from the hypothetical nature of the questions, Agent Knox did respond with respect to what he could recall – relying on his report –and confirmed his contention that Tunstall indeed did not respond as law enforcement was conveying certain information to him at his mother's house.  Defense counsel interprets this response very differently from the Court.  The Court finds no conspiracy here nor any meaningful disparity with respect to the Report and Knox's testimony.

Defendant maintains that the DEA agents elicited incriminating statements from him at his mother's residence; that Agent Knox's lack of recollection about those statements made during the hour and 40 minutes after he was arrested is not credible; and that law enforcement engaged in "a full-scale interrogation/attempt to get Mr. Tunstall to cooperate prior to being brought" to the Major Case Bureau.  *Id.*  Once again, however, counsel does not cite a single piece of testimony from the record to support these contentions (*e.g.*, never explains what the specific "incriminating statements" Tunstall purportedly made at the house and does not define the "full-scale interrogation").  By contrast, the testimony of the two DEA agents – the only witnesses who testified -- established that Tunstall was *not* interrogated at the residence although law enforcement officers were conveying information to him.

"It is well-settled that the actual statements of the defendant are admissible only if they are made voluntarily." *Dickerson v. United States*, 530 U.S. 428, 433-34, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).  The statements must be voluntary based on the "totality of the circumstances."  *United States v. Smith*, No. 14-CR-485, 2015 WL 7177190, at *4 (E.D.N.Y. Nov. 16, 2015).  "'A confession is not voluntary when obtained under circumstances that

overbear the defendant's will at the time it is given.'" *United States v. William*s, 681 F.3d 35, 45 (2d Cir. 2012) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).   A confession is "involuntary" if it is obtained by "techniques and methods offensive to due process, or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad,* 470 U.S. 298, 304, 105 S.Ct. 1285, 84, L.Ed. 2d, 222 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed. Second, 513 (1963)).

The record here is devoid of any evidence that Special Agent Knox or Special Agent Rau coerced the defendant into making inculpatory statements while in custody.  Instead, Agent Knox testified that the defendant was "fairly calm" and was not threatened in any way during the interview.  Tr. 25.  In fact, Tunstall has not alleged any physical abuse by any members of law enforcement.  Likewise, Tunstall has not claimed the use of any psychologically coercive tactics by police or the DEA agents.  Agent Rau testified that he "noticed [Tunstall's] demeanor to be very – very calm.  You know, like, you know being composed but concerned."  Tr. 103. According to Rau, Tunstall's demeanor did not change at all during the interrogation.  Tr. 104. While Rau was going over the evidence, Tunstall "was listening . . . he didn't really make any comment."  Tr. 104-05.  The government has therefore shown that "no threatening statements were made and no physical force was exerted at any point during the interview to pressure the defendant to confess."  *Smith*, 2015 WL 717-7190, at *7 (citing *United States v. Awan*, 384 Fed. App'x 9, 14-15 (2d Cir. 2010).

In addition, there was no evidence adduced at the suppression hearing indicating that Agents Knox and Rau engaged in "repeated and prolonged" questioning set up to or intended to overcome Tunstall's free will.  *See Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988) (The

30

conditions under which a suspect is questioned include "the place where the interrogation is held, and the length of detention."). In fact, the opposite is true here. The agents' questioning of Tunstall took place in an interview room at the Nassau County Major Case Bureau and lasted only 30-45 minutes. Tr. 112. *See United States v. Guarno,* 819 F.2d 28, 31 (2d Cir. 1987) (finding that where interview lasted for approximately two and a half hours, the duration was not coercive); *United States v. Egipciaco,* 389 F. Supp. 2d 520, 525 (S.D.N.Y. 2005) (interrogation lasting two hours held not to be excessively long).

The Court has also considered the relevant characteristics of the defendant, namely, his experience, background, age and education or intelligence. *See Smith,* 2015 WL 7177190, at *8; *Green*, 850 F.2d at 902. There is no evidence in the record that Tunstall suffers from any sort of mental disability. At the time of his arrest, Tunstall was 45 years of age, had lived most of his life on Long Island and was of at least average intelligence. *See* GX 8 (Pre-Trial Services Report). Significantly, Tunstall was not unfamiliar with the criminal justice system, having been arrested at least eight times prior to the instant charges. *Id*. He has multiple convictions for drug trafficking and, pursuant to the Federal Sentencing Guidelines, he is a career offender. Tunstall's frequent encounters with law enforcement personnel prior to the encounter which gave rise to his confession in the current circumstances supports the finding that Tunstall was "aware of his constitutional rights, particularly his right to remain silent." *Guarno*, 819 F.2d at 30.

Tunstall asserts in his declaration that he was "dope sick," "exhausted, frightened, starving, dehydrated, experiencing opioid withdrawal, blurred vision, and cognitive impairment." at the time he was questioned by Special Agents Knox and Rau. Tunstall Decl. ¶¶ 24-26. Agent Knox testified that Tunstall never told him he was dope sick or suffering any of these symptoms during the interview. Tr. 36, 74. Similarly, Agent Rau confirmed that Tunstall never told him he

was dope sick during the interview.  *Id.* 116-117.  Based on their training and experience, Agents Tunstall and Rau testified that they are familiar with individuals experiencing opioid withdrawal and that Tunstall did not exhibit any signs of being dope sick or going through such withdrawal after being taken into custody.  *Id.* 36, 116.

Importantly, there is substantial evidence in the record -- in Tunstall's own words -- which contradicts the statements in his declaration.  Government Exhibits 5 and 7, the NCPD forms, show that Tunstall did not self-report that he was having any medical problems or was dpe sick.  GX 5, 7.  Likewise, the Nassau Cunty Jail intake records – Government Exhibit 9 – on the same day as his arrest disclose that Tunstall did not report using drugs in a recent time frame and noted that he had no withdrawal symptoms.  GX 9.  Moreover, the medical professional who completed the form noted that Tunstall did not appear to be experiencing any medical problem or suffering from withdrawal.  *Id*.  Somewhat ironically, Government Exhibit 6, which contains the contents of Tunstall's cell phone, shows that on the day of his arrest, Tunstall was actually trying to assist a friend who needed a clean urine sample because she was required to take a drug test. GX 6.  And within the information Tunstall provided to Pre-Trial Services on the day of his arrest, Tunstall reported that he had not recently used drugs.  GX 8.  The record itself reflects that Tunstall was alert and responsive throughout the relatively short interview.

The Court finds, therefore, that none of Tunstall's characteristics support a finding that his statements were involuntarily made. Under the "totality of the circumstances" test, the Court concludes that the defendant's statements were "neither improperly induced nor obtained by means of physical violence, but, rather, were completely voluntary."  *Smith***,** 2015 WL 7177190, at \*8; *see United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1986) (confession found be voluntary where defendant was mature individual of "average intelligence, was aware of his right

to remain silent, was treated courteously and was neither "questioned in a hostile environment" nor "subjected to rigorous interrogation."). Tunstall gave the DEA agents the name of his supplier, Alex, whom he had know for a long time. He admitted that he got heroin from Alex which he sold and that he got cocaine from another source. Tr. 31-32. Tunstall acknowledged that he gave heroin he purchased from Alex to Jay Tenem to deliver to the victim and that he expected to be paid by the victim through Tenem.

The statements made by Tunstall at the Major Case Bureau bear out the voluntariness of his confession. Notably, the circumstances surrounding his questioning did not involve any physical force, "psychological duress, threats, [or] unduly prolonged interrogation" which courts have found in other cases when they have concluded that statements were involuntarily made. *See Moore*, 670 F.3d at 233 (citing *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010)). Tunstall was advised of his rights before Agents Knox and Rau began questioning him and he agreed – orally and in writing – to waive them, notwithstanding his self-serving declaration to the contrary. Tunstall's willingness to talk with the DEA Agents "even after he was informed of his rights is itself 'highly probative.'" *Id*. (quoting *Oregon v. Elstad,* 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). There is simply no credible evidence in the record that the defendant was forced into providing statements while in custody. The "credible, detailed and live testimony" of Agents Knox and Rau, which was subject to cross-examination, clearly contradicts Tunstall's description of the interrogation at the Major Case Bureau. *See United States v. Xiaojie Shun*, 1:16 CR-00075, 2019 WL 4396237, at *4 (W.D.N.Y. Apr. 10, 2019). The Court declines to credit the self-serving statements in Tunstall's declaration. *See United States v. Polanco*, 17 F.Supp.2d 262, 264 n. 4 (S.D.N.Y. 1999) ("[T]he self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the hearing.")

Tunstall's other argument for suppression – that his post-arrest questioning violated his Sixth Amendment right to counsel – is equally unavailing. The record here shows that Tunstall did not ask for an attorney at any time while he was at his mother's house, contrary to his assertions. He was not interrogated until after his arrival at the NCPD Major Case Bureau and not until after he was given the appropriate *Miranda* warnings and initialed and signed the "Advice of Rights" form. *See* GX 4. Tunstall answered the agents' questions and never asked for an attorney until the very end of the interview when the parties had come to an impasse. Tr. 38-39; 112-13. At that point, the agents ceased questioning Tunstall, ended the interview and left the interview room.

## V.     CONCLUSION

For the foregoing reasons, the Court concludes that none of defendant Tunstall's post-arrest statements were made involuntarily. It is clear that Tunstall voluntarily confessed to the narcotics-related crimes in question and that no coercive or improper inducement tactics were employed by the DEA agents who questioned him. Essentially, the government has met its burden of proving that defendant Tunstall knowingly, intelligently, and voluntarily waived his *Miranda* rights before giving the post-arrest statements. Consequently, this Court respectfully recommends to Judge Azrack that defendant Tunstall's statements of October 29-30, 2018 not be suppressed and that his motion be DENIED.

## VI.     OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6(a), (e). Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF. A courtesy copy of any objections filed is to

be sent to the Chambers of the Honorable Sandra J. Feuerstein. Any requests for an extension of

time for filing objections must be directed to Judge Feuerstein prior to the expiration of the

fourteen (14) day period for filing objections.  Failure to file objections will result in a waiver of

those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v.*

*Walker*, 118 F.3d 900, 901 (2d Cir. 1997), cert. denied, 522 U.S. 883 (1997); *Savoie v.*

*Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

<strong>SO ORDERED:</strong>

Dated:  Central Islip, New York
           June 10, 2021

                                                    /s/ A. Kathleen Tomlinson
                                                    A. KATHLEEN TOMLINSON
                                                    United States Magistrate Judge