FILED
CLERK
12:30 pm, Aug 12, 2022
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
────────────────────────────────────────X
For Online Publication Only

UNITED STATES OF AMERICA,

    -against-            **ORDER**
                     18-CR-00675 (JMA)

JAMES T. TUNSTALL,

       Defendant.
────────────────────────────────────────X

**AZRACK, United States District Judge:**

  Defendant James T. Tunstall ("Defendant" or "Tunstall") pled guilty, without a plea agreement, to count one of a two-count indictment. Prior to his sentencing, Tunstall objected to certain findings in his Pre-Sentence Investigation Report ("PSR"). (ECF No. 103.) The Court held a Fatico hearing to resolve Defendant's objections. The following are the Court's findings of fact.

## I. BACKGROUND

### A. The Indictment

  On December 19, 2018, a grand jury returned a two-count indictment against Tunstall, also known as "Math," and his co-defendant Jay Tenem ("Tenem"), also known as "Billy." (ECF No. 10.) Count One charges that, between October 26, 2018, and October 29, 2018, Tunstall and Tenem, together with others, participated in a conspiracy to distribute cocaine and heroin, in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846. (Id.) Count Two charges that their substantive distribution of heroin caused the death of a young adult victim, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2. (Id.) On July 14, 2021, Tunstall pled guilty before this Court, without a plea agreement, to Count One of the two-count indictment. (ECF No. 98.)

### B. The Presentence Report

Tunstall's PSR was issued on September 2, 2021. ("PSR," ECF No. 103.) The PSR concluded, among other things, that Tunstall's base offense level under the 21 U.S.C. § 846 offense was 24. (PSR ¶¶ 8,14.) The PSR calculated Tunstall's base offense level by converting the quantities of cocaine and heroin involved in the offense into their equivalent Converted Drug Weight totals. (PSR ¶ 8.) The PSR determined that Tunstall's offense involved a "conservative total" of 260 grams of cocaine and 260 grams of heroin. (PSR ¶ 8.) Applying the relevant guidelines, the PSR calculated that the 260 grams of cocaine was equivalent to 52 kilograms of Converted Drug Weight, and the 260 grams of heroin was equivalent to 260 kilograms of Converted Drug Weight. This results in a total of 312 kilograms of Converted Drug Weight, corresponding to a base offense level of 24, per USSG §§2D1.1(a)(5) and (c)(8). (PSR ¶ 8.)

The PSR also concluded that Tunstall's offense on Count One resulted in the death of an individual, (the "Victim"). (PSR ¶ 10.) Specifically, the PSR found that the drugs Tunstall sold to the Victim directly caused a fatal overdose. (PSR ¶ 99.) The PSR noted that the death could not be considered for guideline purposes but could be considered as an aggravating factor at sentencing. (ECF No. 103-1 at 2.) Taking into the consideration the Victim's fatal overdose, the Probation Office recommended the statutory maximum term of custody (240 months). (ECF No. 103-1 at 1, 4.)

### C. Defendant's Objections to the Presentence Report

On April 22, 2022, Tunstall filed his sentencing memorandum objecting to portions of the PSR. (ECF No. 111.) In his submission, Tunstall stated two objections that were relevant for purposes of the Fatico hearing:

First, Tunstall disputes the PSR's stated amount of narcotics that he allegedly distributed

2

as part of the conspiracy. (PSR ¶ 8.) He argues that he neither admitted to the determined amount in the PSR nor pled guilty to distributing such an amount. (ECF No. 111 at 4.) He further contends that any admission he allegedly made was "unrecorded, vague, and out of context." (Id.)

Second, Tunstall disputes any causal connection between the narcotics he agreed to distribute with his co-defendant Tenem and the fatal overdose of the Victim. (Id. at 3.) Tunstall implies that because he often used the same batch of narcotics as Tenem and the Victim, it therefore is doubtful that the same batch of drugs somehow caused the Victim's fatal overdose. (Id. at 4.)

On May 5, 2022, the Probation Office filed an addendum to the PSR responding to Tunstall's objections. ("Addendum," ECF No. 112.) The Addendum maintained the recommendation of 240 months on the basis that Tunstall was legally responsible for the death of the Victim. After the Government requested a Fatico hearing to resolve the issues in dispute, namely, the drug weight and the cause of the Victim's death, the Court conducted a Fatico hearing on August 2, 2022 to resolve Tunstall's objections to the findings and calculations in the PSR. (ECF No. 119.) The parties did not make any post-hearing submissions.

## II. DISCUSSION

### A. Legal Standard

A Fatico hearing is an evidentiary proceeding to resolve disputed facts prior to sentencing. See United States v. Cuevas, 496 F.3d 256, 260 (2d Cir. 2007); see generally United States v. Fatico, 579 F.2d 707 (2d Cir. 1978). A court may consider a broad range of conduct including uncharged conduct. United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994).

The government need only prove any disputed facts by a preponderance of the evidence. United States v. Vaughn, 430 F.3d 518, 526 (2d Cir. 2005).

In a Fatico hearing, the Federal Rules of Evidence do not strictly apply, Fed. R. Evid. 1101(d)(3), and the court may consider any relevant information that has sufficient indicia of

3

reliability. U.S.S.G. § 6A1.3(a). "The procedures used at sentencing are within the discretion of the district court so long as the defendant is given an adequate opportunity to present his position as to matters in dispute." United States v. Maurer, 226 F.3d 150, 151 (2d Cir. 2000).

**B. Findings of Facts**

At the Fatico hearing, the Government introduced multiple exhibits into evidence and presented the testimony of two witnesses: co-defendant and cooperating witness Tenem, and Drug Enforcement Administration Special Agent Francis Rau ("Special Agent Rau"). (ECF No. 120.)

Tenem testified as to the nature of his relationship with Tunstall, and his involvement with the charged conspiracy. Specifically, Tenem testified Tunstall was his only source for daily purchases of cocaine and heroin during the relevant time period and that on October 28, 2022, he delivered drugs to the Victim that caused the fatal overdose. The Court also heard testimony from Special Agent Rau, who assisted in the investigation of Tunstall and the Victim's death. Special Agent Rau testified to the evidence recovered from the scene of the Victim's death including the drugs and the Victim's phone, which revealed communications related to a drug purchase from Tunstall. The Government's witnesses were cross-examined by Tunstall's counsel. Tunstall did not call any witnesses and did not testify himself.

The Court finds the testimony of the Government's witnesses to be fully credible and credits the entirety of their testimony. Their testimony was detailed, specific, and reliable. Having carefully considered the evidence in the record, I find that the Government has proven the facts summarized below by a preponderance of the evidence.

**1. The total Converted Drug Weight is approximately 312 kilograms.**

The Government has proven by a preponderance of the evidence that the drug weight attributable to the conspiracy involves at least 100 but less than 400 kilograms of Converted Drug Weight.

4

From mid-to-late August 2018 up until his arrest on October 29, 2018, Tunstall was Tenem's only supplier for narcotics, and Tunstall sold him at minimum 20 to 30 grams of cocaine and heroin each week.

Tenem had first met Tunstall through his court-mandated substance treatment program at Odyssey House. (Tr. 24.)  During the course of his group meetings, Tenem became acquainted with Tunstall, who also hailed from Long Island. (Tr. 26-27.)  After Tenem's completion of the substance treatment program in August 2018, he began purchasing drugs from Tunstall. (Tr. 31-33.)  Tunstall had offered to give Tenem "a few samples" for his girlfriend. (Tr. 32.) Tenem's drug use progressed and at some point, Tenem began regularly purchasing heroin and cocaine from Tunstall on a daily basis, sometimes "numerous times a day." (Tr. 33.)

The Court credits Tenem's estimate that a single transaction was often in the amounts of .3 to .4 grams for heroin and roughly .5 grams for cocaine. (Tr. 33-36.) It was not uncommon for Tenem to spend between $150 to $200 a day to buy cocaine and heroin for him and his girlfriend. (Tr. 33-34.) Tenem knew to a reasonable certainty the quantity of the drugs he was receiving, because Tunstall often weighed the drugs right in front of him. (Tr. 35.)  Tenem also testified that he kept his own scale to ensure he was getting "the bang for [his] buck." (Tr. 65.)

Tenem recalled an occasion where Tunstall asked him to assist in breaking down a large piece of heroin. (Tr. 36.)  Tenem described a bundle of heroin that was approximately a foot in length and maybe an inch and a half in diameter. (Tr. 36.)  Tenem stated that the bundle was akin to the size, diameter, and shape of a "churro," the Mexican pastry known for its long-fluted shape. (Tr. 36.)  He and Tunstall tried a piece of the "churro", which is how he knew it was heroin. (Tr. 36.)  On that occasion, Tenem and Tunstall spent close to an hour breaking the churro of heroin into smaller quantities. (Tr. 36.)

After sharing this testimony, Tenem was shown Government Exhibit 8 which consisted of a photo of a bundle of heroin which had been retrieved from Tunstall's phone. (Tr. 38, 117-118.) Tenem recognized the bundle of heroin as appearing "exactly like the end of the churro type piece of heroin" distributed by Tunstall.  (Tr. 37.)

Up until his arrest, Tenem only purchased his drugs from Tunstall. The Court credits Tunstall's testimony that as his addiction became more severe, he relied on Tunstall as his sole supplier, in part, because he knew Tunstall sometimes allowed him to pay with gift cards instead of cash. (Tr. 42-43.)

Special Agent Rau, a supervisory agent with over two decades of federal drug enforcement experience, further corroborated Tenem's testimony regarding the stated drug quantities and prices. Special Agent Rau stated that "heroin packaged like a churro, about 1 foot long and one and a half inches in diameter" would likely amount to 100 to 300 grams of heroin. (Tr. 116.)  He also identified Government Exhibit 8 as the image retrieved from Tunstall's phone as part of the investigation. (Tr. 118.)

Based on the above, the Court agrees with the PSR that Tunstall's offense involved a "conservative total" of 260 grams of cocaine and 260 grams of heroin.  As such, the Government has proven by a preponderance of the evidence that the converted drug weight attributable to the conspiracy is approximately 312 kilograms.

**2.  The drugs sold by Tunstall caused the Victim's fatal overdose.**

The Government has proven by a preponderance of the evidence that Tunstall's sale of heroin to the Victim, a twenty-four year old adult, on October 28, 2019 caused the fatal overdose.

As a preliminary matter, the parties do not dispute the Victim died of a fatal drug overdose. (Tr. 142, 148.).  Moreover, the January 31, 2019 Report of Autopsy prepared by the Nassau County

6

Medical Examiner's Office ("NCME") establishes that the Victim's cause of death was indeed an acute heroin intoxication.  (See ECF No. 98.)

The Court credits Tenem's testimony that on October 28, 2018, he delivered a package of heroin to the Victim on behalf of Tunstall.  (Tr. 43-51.)  That day, Tenem reached out to Tunstall to buy drugs for himself.  (Tr. 21,43-44.)  When Tenem went to pick up the drugs, Tunstall also asked Tenem to deliver some heroin and cocaine to the Victim, who Tunstall described as a "friend" or "client."  (Tr. 44.)  Tunstall had met the Victim through an outpatient group and told Tenem that the Victim lived close-by in Jericho.  (Tr. 44, 51, 60.)  Tenem agreed to deliver the drugs to the Victim. (Tr. 44.) Tunstall then provided Tenem's contact information to the Victim.  (Tr. 70,99.)  The Victim texted Tenem to confirm details of the drug delivery.  (Tr. 48, 50-51.)

Before Tenem delivered the heroin to the Victim, he stopped by his parents' home in order to try some of the drugs for himself.  (Tr. 45-46.)  Tenem testified that the drugs were wrapped in a napkin in scotch tape.  (Tr. 45.)  Tenem was very familiar with how Tunstall packaged the drugs. (Tr. 76.)  Tenem believed that Tunstall wrapped the drugs in scotch tape in order thwart him from opening the package. (Tr. 46.)  However, Tenem successfully opened the package and retrieved a small amount of heroin, which he described as having a brown appearance and small pebble shape. (Tr. 46.)  Afterwards, Tenem repackaged the drugs with scotch tape.  He also testified that he did nothing else to the package. (Tr. 47.)  When Tenem arrived in the Victim's neighborhood, he deposited the wrapped-up heroin in an empty Newports cigarette box.  (Tr. 47-48.)  The Victim came to Tenem's vehicle and gave him cash for the drugs.  (Tr. 50-51.)  Tenem handed the Victim the Newports cigarette box containing the heroin and drove directly back to Brentwood to give the money to Tunstall.  (Tr. 50-51.)  Tunstall later texted the Victim to ensure the drug delivery was received.  (Tr. 111.)

7

Later on that evening, the Victim attended a softball game with his girlfriend. (Tr. 134, 136.) After the softball game, the Victim's girlfriend observed that he appeared severely impaired. (Tr. 134.) The Victim could not dress himself and required assistance. After his girlfriend helped him into bed, the Victim appeared to be sleeping, but became unresponsive shortly thereafter. (Tr. 135-136.) The Victim later died that night or by the following day.

Special Agent Rau testified, that as part of the investigation, the Victim's phone was recovered and analyzed for evidence. (Tr. 98.) The Court credits his testimony that a review of the Victim's phone indicated that Tunstall was the source of the Victim's most recent purchase of narcotics and that Tunstall was the Victim's only identified supplier. (Tr. 141.) Text messages between the Victim and Tunstall, who was also known as "Math," discussed a drug purchase on the day of the Victim's overdose. (Tr. 98.) Tenem's number was saved in the Victim's phone and their text messages discussed the delivery of narcotics which had occurred on October 28, 2018. (Tr. 99.) Notably, there was no evidence in the Victim's phone that he had made any other purchases of narcotics, from any persons other than Tunstall, in the entire week leading up to the fatal overdose. (Tr. 100).

In addition, Special Agent Rau testified that, as part of the investigation, a Newports cigarette box containing small brown pellets of heroin was recovered from the Victim's bedroom. During his testimony Tenem reviewed a photograph of the recovered Newports cigarette box and drug paraphernalia. (See Government Exhibit 1.) The Court credits Tenem's testimony that he immediately recognized the assortment of items, specifically, the Newports cigarette box, pieces of napkin, and small brown pellets of heroin as the items he delivered to the Victim. Tenem explained that he had a habit of distinctively ripping the cigarette box on the side in order to make a makeshift scoop for the heroin. (Tr. 52-53.) He also explained that the heroin he delivered was

8

wrapped in a piece of napkin like the heroin in the photo, and the color of heroin in the photo was the same color of the heroin that he remembered dropping off on October 28, 2018. (Tr. 55-56.)

On cross-examination, Tenem testified, with specificity, his ability to quickly unwrap the packaged heroin and rewrap it, which strengthens the finding that he was very familiar with the contents of the drug package. Finally, the Court credits evidence in the record that the victim was not an experienced heroin user and likely had a low tolerance to the drugs given his recent period of sobriety.

Based on the above, the Government has established by a preponderance of the evidence that Tunstall's sale of heroin to the Victim on October 28, 2019 caused his fatal overdose.

### III.  CONCLUSION

Based on the findings of fact above, the Court concludes that Tunstall's offensive conduct involved the distribution of at least 312 kilograms of Converted Drug Weight and therefore the base offense level is 24 under USSG §§2D1.1(a)(5) and (c)(8).  The Court also concludes that Tunstall caused the death of the Victim a result of the drug transaction.

**SO ORDERED.**

Dated: August 12, 2022
Central Islip, New York

                                                /s/  (JMA)
                                      JOAN M. AZRACK
                                      UNITED STATES DISTRICT JUDGE